1
2
3
4
5

Ryan E. Hatch (SBN 235577)
ryan@hatchlaw.com
HATCH LAW, PC
13323 Washington Blvd., Suite 302
Los Angeles, CA 90066
Tel: 310-279-5076
Fax: 310-693-5328

6

(*additional counsel listed on next page*)

7
8

*Attorneys for Plaintiff*
*MICROPAIRING TECHNOLOGIES LLC*

9
10
11

# UNITED STATES DISTRICT COURT

12

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

13
14

### SOUTHERN DIVISION

15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| MICROPAIRING TECHNOLOGIES LLC,<br><br>                Plaintiff,<br>    v.<br><br>AMERICAN HONDA MOTOR CO., INC.,<br><br>                Defendant. | Case No. 2:21−cv−04034−JVS(KESx)<br><br>**PLAINTIFF MICROPAIRING TECHNOLOGIES LLC'S SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT**<br><br>**JURY TRIAL DEMANDED** |

Edward R. Nelson III (Texas SBN 00797142)
ed@nelbum.com
*admitted pro hac vice*
Ryan P. Griffin (Texas SBN 24053687)
ryan@nelbum.com
*admitted pro hac vice*
Brian P. Herrmann (Texas SBN 24083174)
brian@nelbum.com
*admitted pro hac vice*
NELSON BUMGARDNER CONROY PC
3131 West Seventh Street
Suite 300
Fort Worth, TX 76107
Telephone: 817.377.9111

Timothy E. Grochocinski (Illinois SBN 6295055)
tim@nelbum.com
*admitted pro hac vice*
C. Austin Ginnings (New York Bar No. 4986691)
austin@nelbum.com
*admitted pro hac vice*
NELSON BUMGARDNER CONROY PC
15020 S. Ravinia Avenue, Suite 29
Orland Park, Illinois 60462
Telephone: 708.675.1974

*Attorneys for Plaintiff*
*MICROPAIRING TECHNOLOGIES LLC*

Plaintiff MicroPairing Technologies LLC ("MicroPairing") files this Second Amended Complaint ("SAC") for patent infringement against Defendant American Honda Motor Co., Inc. ("Honda") for infringement of U.S. Patent Nos. 6,778,073 ("the '073 patent"), 7,793,136 ("the '136 patent,) 7,178,049 (the '049 patent"), 8,020,028 ("the '028 patent), and 8,006,117 ("the '117 patent"), alleging as follows:

## THE PARTIES

1.     Plaintiff MicroPairing Technologies LLC is a Texas limited liability company located in Plano, Texas.

2.     Defendant American Honda Motor Co., Inc. is a California Corporation with its principal place of business located at 1919 Torrance Blvd, Torrance, California 90501.

## JURISDICTION AND VENUE

3.     This action arises under the patent laws of the United States, 35 U.S.C. § 101, *et seq.*  This Court's jurisdiction over this action is proper under the above statutes, including 35 U.S.C. § 271, *et seq.*, 28 U.S.C. § 1331 (federal question jurisdiction), and 28 U.S.C. § 1338 (jurisdiction over patent actions).

4.     This Court has personal jurisdiction over Honda in accordance with due process and/or the California Long Arm Statute because, among other things, Honda is a California corporation with its principal place of business in this District.

5.     Further, this Court has personal jurisdiction over Honda because it has engaged, and continues to engage, in continuous, systematic, and substantial activities within this state, including the substantial marketing and sale of products and services within this state and this District.  Indeed, this Court has personal jurisdiction over Honda because it has committed acts giving rise to MicroPairing's claims for patent infringement within and directed to this District, has derived substantial revenue from its goods and services provided to individuals in this state and this District, and maintains a regular and established place of business in this District, including its principal place of business in Torrance.

6.      Relative to patent infringement, Honda has committed and continues to commit acts in violation of 35 U.S.C. § 271, and has made, used, marketed, distributed, offered for sale, and/or sold infringing products and services in this state, including in this District, and otherwise engaged in infringing conduct within and directed at, or from, this District.  Such infringing products and services, namely Honda and Acura vehicles with infotainment systems and/or that operate on the AUTOSAR platform, have been and continue to be distributed to, offered for sale, sold, and used in this District and the infringing conduct has caused, and continues to cause, injury to MicroPairing, including injury suffered within this District.  These are purposeful acts and transactions in this state and this District such that Honda reasonably should know and expect that it can be haled into this Court because of such activities.

7.      Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(b) because Honda resides in this district under § 1400(b) due to it being a California Corporation with its principal place of business in this District. Additionally, as a separate and independent basis for venue under § 1400(b), Honda has a regular and established place of business in this District (at its principal place of business in Torrance) and has committed extensive of acts of infringement in this District through sales of Honda and Acura vehicles with infotainment systems and/or that operate on the AUTOSAR platform.

### THE PATENTS-IN-SUIT

8.      The '073 patent is entitled, "Method and Apparatus for Managing Audio Devices."  The '073 patent lawfully issued on August 17, 2004 and stems from U.S. Patent Application No. 09/892,295, which was filed on June 26, 2001.  A copy of the '073 patent is attached hereto as Ex. 1.

9.      The '136 patent is entitled, "Application Management System with Configurable Software Applications."  The '136 patent lawfully issued on September

7, 2010 and stems from U.S. Patent Application No. 10/132,886, which was filed on April 24, 2002.  A copy of the '136 patent is attached hereto as Ex. 2.

10.    The '049 patent is entitled, "Method for Multi-Tasking Multiple Java Virtual Machines in a Secure Environment."  The '049 patent lawfully issued on February 13, 2007 and stems from U.S. Patent Application No. 10/132,886, which was filed on April 24, 2002. A copy of the '049 patent is attached hereto as Ex. 3.

11.    The '028 patent is entitled, "Application Management System for Mobile Devices."  The '028 patent lawfully issued on September 13, 2011 and stems from U.S. Patent Application No. 10/132,886, which was filed on April 24, 2002. A copy of the '028 patent is attached hereto as Ex. 4.

12.    The '117 patent is entitled, "Method for Multi-Tasking Multiple Java Virtual Machines in a Secure Environment."  The '117 patent lawfully issued on August 23, 2011 and stems from U.S. Patent Application No. 10/132,886, which was filed on April 24, 2002. A copy of the '117 patent is attached hereto as Ex. 5.

13.    MicroPairing is the owner of the patents-in-suit with all substantial rights, including the exclusive right to enforce, sue, and recover damages for past and future infringements.

14.    MicroPairing's claims do not have damages limited by 35 U.S.C. 287. MicroPairing is only seeking damages for: (1) infringements of claims of the '073 and '136 patents accruing upon and after notice to Honda; (2) infringement of method claims of the '049 and '028 patents; and (3) infringement of claims of the '117 patent accruing upon and after service via ECF of the First Amended Complaint (ECF 45).

15.    The claims of the patents-in-suit are directed to patent eligible subject matter under 35 U.S.C. § 101.  They are not directed to any abstract idea, and the technologies covered by the claims comprise vehicle systems and/or consist of ordered combinations of features and functions that, at the time of invention, were not, alone or in combination, well-understood, routine, or conventional.

16.     The specification of the '073 patent discloses shortcomings in the prior art and then explains, in detail, the technical way the claimed inventions resolve or overcome those shortcomings.  For example, the '073 patent explains that car audio systems had a number of issues, including that: (1) "[a]ny other portable audio sources brought into the car cannot use the car speakers or amplifier system;" (2) "in-dash audio devices or portable audio devices brought into the car [] can disrupt the attention of the car driver;" and (3) "[o]ther types of audio devices, such as cellular telephones, are difficult to operate and hear while driving in a car." Ex. 1 at 1:5-28.  To solve these problems, the '073 patent discloses the following invention:

> A vehicle audio system includes a wireless audio sensor configured to wirelessly detect different portable audio sources brought into the vehicle. Audio output devices are located in the vehicle for outputting audio signals from the different audio sources. A processor selectively connects the different audio sources to the different audio output devices.

*Id.* at 2:31-36.

17.     The '073 patent specification goes on to describe an "audio manager 14 [that] detects and communicates with the different wireless audio sources using any one of a variety of wireless communication protocols, such as Bluetooth or IEEE 802.11." *Id.* at 2:39-42.  This audio manager also "detect[s] different portable audio output devices and any audio output devices contained in the audio output device." *Id.* at 2:53-60.  The audio manager further "displays the different audio output devices on GUI 30." *Id.* at 2:61-62.  "[T]he audio manager 14 in block 42 monitors the area around and inside the vehicle 12 for any audio sources or audio output devices that may be transmitting a wireless signal.  Any detected audio sources or audio output devices are displayed on the GUI 30 in block 44.  The data manager in block 46 then determines what applications are associated with the different audio sources." *Id.* at 3:25-32.  To decide which applications to output to audio,

> The data manager 14 in block 50 identifies any priorities and security values associated with the identified audio applications. In block 52, the data manager 14 identifies requests to output different ones of the audio sources to different ones of the audio output devices. The selected audio

application may have a higher priority than the audio application that is currently connected to the selected audio output device. If the priority of the requesting audio application is the same or higher than the currently connected audio application, then the audio manager 14 in block 56 replaces the audio application currently coupled to the audio output device with the selected audio application. If the requesting audio application has a lower priority than the audio application currently coupled to the audio output device, then the audio manager in block 54 will not connect the new audio application.

*Id.* at 3:36-53.

18.     Solutions to the problems outlined in the '073 patent are, for example, embodied in claim 10:

A vehicle audio system, comprising:

a wireless audio sensor configured to wirelessly detect different audio sources brought into or next to a vehicle;

wireless audio output devices for outputting audio data having assigned priority values; and

a processor for selectively connecting the different audio sources to the audio output devices according to the assigned priority values for the audio data.

*Id.* at claim 10.  The wireless audio sources are connected selectively to differing audio output devices according to the ***assigned priority values*** for the audio data.  A wireless audio sensor detects the different sources brought into the vehicle, and a processor connects these sources to the output devices.  This claim solves the issues of: (1) other portable audio sources not being able to use the car speakers; (2) audio devices potentially distracting the driver; and (3) other types of audio devices being difficult to hear and operate while driving a car.

19.     Mr. Steven Loudon has been retained on behalf of MicroPairing to provide a declaration in connection with the instant litigation.  *See* Declaration of Steven Loudon in Support of Plaintiff's Second Amended Complaint for Patent Infringement, ¶ 1 (hereinafter "Loudon Decl." attached as Exhibit 11).  Mr. Loudon has conducted a review of the '073 patent and provided opinions on the nature of the claimed invention, the state of the prior art as of the filing date of the '073 patent, improvements to the prior art provided by the claimed invention of the '073 patent and

1  disclosed in the specification, and benefits associated with the claimed invention.

2  Loudon Decl., ¶ 1.

3      20.    In Mr. Loudon's opinion, "the invention recited in claim 10 of the '073

4  patent brings together numerous unconventional elements and steps previously

5  unknown in the field of audio output systems in automobiles." Loudon Decl., ¶ 24.

6  According to Mr. Loudon, claim 10 of the '073 patent "recites an unconventional

7  combination that was previously unheard of and that improves automotive audio

8  output systems, for example by overcoming several problems with prior technology

9  by reducing or eliminating the potential for driver distraction in switching audio

10  output sources and/or the potential for drivers to overlook or fail to perceive signals

11  from vehicular safety systems." *Id.*

12     21.    In Mr. Loudon's opinion, claim 10 "relates to improved automotive audio

13  systems, and not to the abstract idea of selecting an audio source based on a priority of

14  the audio data, as Honda suggests." *Id.*, ¶ 26. According to Mr. Loudon, claim 10

15  "describes improved aspects of automotive audio systems that were unconventional at

16  the time of the filing of the application leading to the '073 patent (*i.e.*, June 26,

17  2001)." *Id.* According to Mr. Loudon, as one example, "claim 10 includes 'a wireless

18  audio sensor configured to wirelessly detect different audio source brought into or

19  next to a vehicle,'" and "[t]he specification of the '073 patent further describes such

20  wireless audio sensors, indicating that '[a] processor in the audio manager 14 receives

21  communication data and audio data detected by the [wireless audio] sensor 28 and

22  then selectively connects different audio sources detected in the vehicle 12 to the

23  different audio output devices.'" *Id.* (citing '073 patent, 2:18-22). As Mr. Loudon

24  indicates, "[i]n addition, the specification describes that '[t]he audio manager detects

25  and communicates with the different wireless audio sources using any one of a variety

26  of wireless communication protocols, such as Bluetooth or IEEE 802.11.'" *Id.* (citing

27  '073 patent, 2:39-42). In Mr. Loudon's opinion, "while such wireless audio sensors

28  are very prevalent in vehicles today, they were unconventional in vehicles in June

8                    SECOND AMENDED COMPLAINT

1    2001, either alone or in combination with the other features of claim 10 of the '073

2    patent," and "Honda's abstract idea assertion grossly oversimplifies the invention of

3    claim 10 by overlooking this unconventional element."  *Id.*

4        22.    According to Mr. Loudon, as another example, "claim 10 recites

5    'wireless audio output devices for outputting audio data having assigned priority

6    values,' as well as 'a processor for selectively connecting the different audio sources

7    to the audio output devices according to the assigned priority values for the audio

8    data.'"  *Id.*, ¶ 27.  In Mr. Loudon's opinion, "the use of assigned priority values in

9    wireless audio output devices in vehicle audio systems was also unconventional in

10   June 2001, either alone or in combination with the other features of claim 10 of the

11   '073 patent."  *Id.*  Similarly, according to Mr. Loudon, "the use of processors for

12   selectively connecting the different audio sources to the audio output devices

13   according to such assigned priority values was also unconventional in June 2001."  *Id.*

14   According to Mr. Loudon, "[w]hile Honda's characterization of claim 10

15   acknowledges that the claim recites using 'assigned priority values,' Honda's

16   characterization of claim 10 grossly oversimplifies the invention of the claim."  *Id.*

17   According to Mr. Loudon, under Honda's characterization, "such priority values are

18   merely subjective user preferences, and Honda's characterization ignores the

19   inventors' description in claim 10 itself and in the specification."  *Id.*

20       23.    In Mr. Loudon's opinion, the language of claim 10 itself contradicts

21   Honda's characterization.  *Id.*, ¶ 28.  According to Mr. Loudon, claim 10 of the '073

22   patent "expressly indicates that the 'wireless audio output devices' in the claimed

23   vehicle audio system have 'assigned priority values.'"  *Id.*  According to Mr. Loudon,

24   "[s]uch assigned values differ significantly from the subjective user preferences to

25   which Honda attempts to compare the claim."  *Id.*  According to Mr. Loudon, "[t]hat

26   difference is further shown by the inventors' description of the 'assigned priority

27   values' in the '073 patent specification.'"  *Id.*  According to Mr. Loudon, as one

28   example, "the specification describes that the audio manager in the vehicle audio

system 'identifies any priorities and security values associated with the identified audio applications' and 'identifies requests to output different ones of the audio sources to different ones of the audio output devices.'" *Id.* (citing '073 patent, 3:38-42). According to Mr. Loudon, "'[i]f the priority of the requesting audio application is the same or higher than the currently connected audio application, then the audio manager . . . replaces the audio application currently coupled to the audio output device with the selected audio application.'" *Id.* (citing '073 patent, 3:45-49). Conversely, according to Mr. Loudon, "'[i]f the requesting audio application has a lower priority than the audio application currently coupled to the audio output device, then the audio manager . . . will not connect the new audio application.'" *Id.* (citing '073 patent, 3:49:53).

24.     In Mr. Loudon's view, "[t]he '073 patent specification provides several practical examples of how these assigned priority values can be implemented in the improved vehicle audio systems covered by the claims, including by claim 10." *Id.*, ¶ 29. According to Mr. Loudon, as one example, "the specification describes an example where 'an audio source that generates a collision warning signal may have a high priority that can override lower audio applications, such as audio applications that only play music.'" *Id.* (citing '073 patent, 3:56-59). According to Mr. Loudon, "[s]uch an example provides a crucial safety benefit for users of the improved vehicle audio systems described and claimed in the '073 patent," at least because "[b]y having the vehicle audio system use the assigned priority values to allow collision warning signals to override, *e.g.*, music playback, the vehicle audio system enhances the likelihood that a user will more immediately be alerted to the collision warning and more likely be able to react to avoid a collision." *Id.*

25.     In addition, according to Mr. Loudon, "such an example of having the vehicle audio system use the assigned priority values to allow collision warnings to override, *e.g.*, music playback, the vehicle audio system eliminates the need for the user to do so manually, as Honda suggests the user could do in its abstract idea

formulation." *Id.*, ¶ 30.  According to Mr. Loudon, "Honda's proposed abstraction actually highlights one of the technological problems (*i.e.*, overcoming the need to manually switch audio sources) that the technological solution presented by claim 10 of the '073 patent solves." *Id.*  According to Mr. Loudon, "[t]he '073 patent itself separately describes a user's ability to manually perform such processes, in a manner that does not rely upon the priority values recited in claim 10." *Id.* (citing '073 patent, 3:4-14).

26.     In Mr. Loudon's opinion, "these elements of claim 10—not only individually, but especially as a combination—demonstrate that claim 10 is directed to an improved vehicle audio system with unconventional components (and an even more unconventional combination of components), rather than to the abstract idea that Honda asserts." *Id.*, ¶ 31.

27.     Further, in Mr. Loudon's opinion, "the vehicle audio system of claim 10 addresses the technological shortcomings of then-existing vehicle audio systems, in a manner that (as the '073 patent itself describes) makes the claimed vehicle audio systems a significant technological solution to this problem and make those claimed systems an improvement over such existing systems in a variety of ways, including improving the driver and vehicle occupants' safety and enhancing the occupants' entertainment experience." *Id.*, ¶ 32.  In Mr. Loudon's opinion, "claim 10 recites a specific technological improvement over prior systems, resulting in an improved vehicle audio system." *Id.*

28.     According to Mr. Loudon, "[t]he specification of the '073 patent specifically describes the problems with vehicle audio systems that existed as of June 2001, in a way that reinforces how the improved vehicle system recited in claim 10 is unconventional and an improvement over prior art systems and techniques." *Id.*, ¶ 33.  According to Mr. Loudon, "the Background section of the specification describes how '[i]n-dash audio devices or portable audio devices brought into the car[] can disrupt the attention of the car driver.'" *Id.* (citing '073 patent, 1:15-16).  According to Mr.

Loudon, as one example, "the specification indicates that 'if the audio system is being played too loud, the car driver may not hear a siren or other outside noises,' which can contribute to possible accidents." *Id.* (citing '073 patent, 1:16-19).  According to Mr. Loudon, the '073 patent similarly "describes how 'audio devices, such as cellular telephones, are difficult to operate and hear while driving a car,' and how users struggle to press buttons or and hear someone talking on the phone over other audio sources in the car." *Id.* (citing '073 patent, 1:20-26).

29.    According to Mr. Loudon, "[t]o address these shortcomings of existing systems, the inventors of the '073 patent invented improved vehicle audio systems, including the system claimed in claim 10." *Id.*, ¶ 34.  According to Mr. Loudon, "claim 10 recites elements (*i.e.*, 'a wireless audio sensor configured to wirelessly detect different audio sources brought into or next to a vehicle,' 'wireless audio output devices for outputting audio data having assigned priority values,' and 'a processor for selectively connecting the different audio sources to the audio output devices according to the assigned priority values for the audio data') that were not only individually unconventional, but were even more unconventional as a combination." *Id.*  According to Mr. Loudon, "[b]y utilizing wireless audio sensors to detect different audio sources and allowing the vehicle's audio system to communicate with such devices wirelessly, the user (whether the driver or a passenger) is not constrained by the audio output options provided by the car's built-in equipment (*e.g.*, in-dash radio, CD player, etc.) or hard-wired connections to external devices." *Id.*

30.    In addition, according to Mr. Loudon, "by including in the vehicle audio system wireless audio output devices having assigned priority values, and in turn having a processor use such assigned priority values to selectively connect audio sources to the output devices according to such assigned priority, the driver is not distracted by the process of manually changing audio sources, such as by tuning to weather or traffic reports as contemplated by Honda's (oversimplifying) abstract idea formulation." *Id.*, ¶ 35.

31.     According to Mr. Loudon, "one manner in which the '073 patent describes using the assigned priority values to replace the audio output source coupled to the audio output device is when a collision warning system detects a collision condition and requests to output a collision warning." *Id.*, ¶ 36 (citing '073 patent, 3:38-48, 4:51-58).  According to Mr. Loudon, "[i]n that scenario, by replacing the prior audio output (*e.g.*, music playback) with the collision warning audio greatly enhances the user's ability to promptly hear the warning and avoid the collision." *Id.* In contrast, as Mr. Loudon indicates, "in systems where there was no such override (and the collision warning was either output simultaneously with the music playback, or through a separate audio output device), the user may not hear the collision warning (either as quickly, or at all) and may be more likely to have a collision." *Id.*

32.     In Mr. Loudon's opinion, "each of the elements of claim 10 indicate[s] how they accomplish their intended result, particularly when those claim elements are properly understood in light of the '073 patent specification." *Id.*, ¶ 37.  According to Mr. Loudon, as one example, "claim 10's wireless audio sensor 'wirelessly detects different portable audio sources brought into, or next to, the vehicle' . . . , and then '[a] processor in the audio manager 14 receives communication data and audio data detected by the sensor 28 and then selectively connects different audio sources in the vehicle 12 to the different audio output devices.'" *Id.* (citing '073 patent, 2:11-12, 2:18-22).

33.     According to Mr. Loudon, "the language of claim 10 (when properly understood in light of the '073 patent specification) describes how the claimed vehicle audio system uses the assigned priority values of the wireless audio output devices to allow a processor in the system to selectively connect audio sources to the audio output devices in the system." *Id.*, ¶ 38.  According to Mr. Loudon, "[i]n one example described in the '073 patent, the audio output source is a collision warning system, and when that collision warning system determines that a collision is possible and requests to output a collision warning sound to the audio output devices, the processor

determines that the collision warning system has a higher priority value than the existing music playback audio source and instead couples the collision warning system to the audio output devices." *Id.* (citing '073 patent, 3:38-48; 4:51-58).

34. According to Mr. Loudon, "[i]n another example described in the specification, 'a car radio may be playing a new weather report from the car speakers,' and '[a] user . . . may move a CD audio source over the vehicle speaker icons.'" *Id.*, ¶ 39 (citing '073 patent, 3:63-66). According to Mr. Loudon, "[i]n that scenario, the system can determine that 'the radio weather report contains a higher priority value than a priority value associated with the music played over the portable CD player,' and that the vehicle audio system can wait until after the weather report finishes to play the CD player music over the vehicle's speakers." *Id.* (citing '073 patent, 3:66-4:10).

35. In Mr. Loudon's opinion, "claim 10 therefore recites a specific improvement over prior systems, resulting in an improved vehicle audio system and its therefore patent-eligible." *Id.*, ¶ 40.

36. In Mr. Loudon's opinion, "other United States patent applications and publications, that were filed years after the '073 patent, further support [his] opinion that the inventions claimed in the '073 patent are not directed to ineligible subject matter." *Id.*, ¶ 41. For example, according to Mr. Loudon, U.S. Patent No. 8,275,307 ("the '307 Qualcomm Patent"), attached as Exhibit B to Mr. Loudon's declaration, "recognized that in July 2006, five years after the '073 patent was originally filed, there still existed a need for an in-vehicle audio environment that would prioritize communication channels and audio sources." *Id.*, ¶ 42 (citing '307 Qualcomm Patent, 1:5-2:40). According to Mr. Loudon, "the '307 Qualcomm Patent recognized that there may be multiple audio sources in a given vehicle and that this "cluttered audio environment" presents numerous problems." *Id.* (citing '307 Qualcomm Patent, 2:3-20).

37.     According to Mr. Loudon, the '307 Qualcomm Patent indicates that "a drive engaged in a cell phone conversation or listening to music may miss a directional instruction from the vehicle navigation system," and that "[i]n response, the trucker can pause the conversation or reduce the volume of the radio, and request that the directional instruction be repeated," but that as a result "a real-time message coming over the CB radio is simply lost." *Id.*, ¶ 43 (citing '307 Qualcomm Patent, 2:4-11).

38.     According to Mr. Loudon, "[t]he '307 Qualcomm Patent goes on to indicate that at least one solution to this problem is to prioritize the audio sources." *Id.*, ¶ 44 (citing '307 Qualcomm Patent, 2:44-50, 2:60-3:2, 3:41-52).

39.     According to Mr. Loudon, "[d]uring prosecution of the '307 Qualcomm Patent, the United States Patent and Trademark Office ("PTO") rejected the Qualcomm patent claims at least three times based, at least in part, on the '073 patent's prior publication U.S. Publication No. 2002/0196134 to Lutter, et al." *Id.*, ¶ 45.

40.     According to Mr. Loudon, U.S. Patent No. 8,654,995 ("the '995 Patent"), which is attached as Exhibit C to Mr. Loudon's declaration, "recognized that in April 2007, nearly six years after the '073 patent was originally filed, there still existed a need for an in-vehicle 'audio control system that can manage and control multiple audio sources.'" *Id.*, ¶ 47 (citing '995 Patent, 1:32-35). According to Mr. Loudon, "[a]s a technological solution to this technological problem, the '995 Patent indicates that the audio sources may be prioritized." *Id.* (citing '995 Patent, 3:50-65, 4:17-23).

41.     As Mr. Loudon notes, "[d]uring prosecution of the '995 Patent, the PTO rejected the '995 Patent claims at least five times based, at least in part, on the '073 patent." *Id.*, ¶ 48.

42.     In Mr. Loudon's opinion, "years after the '073 patent was filed, others in the art recognized that the technological problem of how to deal with multiple audio sources in a vehicle still existed and that a technological solution (*e.g.*, using priorities

to determine which source to connect to an output at a given time) was needed." *Id.*, ¶ 49.  According to Mr. Loudon, "[t]his further supports [his] opinion that the inventions claimed in the '073 patent are directed to patent eligible subject matter and were not well-understood, routine, and conventional as of June 26, 2001, the date the application that issued as the '073 patent was filed." *Id*.

43.     The specification of the '136 patent also discloses shortcomings in the prior art and then explains, in detail, the technical way the claimed inventions resolve or overcome those shortcomings.  The specification of the '136 patent discusses Java virtual machines (JVMs), which make "it possible for Java application programs to be built that can run on any platform without having to be rewritten or recompiled by the programmer for each separate platform." Ex. 2 at 1:27-34.  The specification also describes the Jini system, which "extends the Java application environment from a single virtual machine to a network of machines. . . .  The Jini infrastructure provides mechanisms for devices, services, and users to join and detach from a network.  Jini systems are more dynamic than is currently possible in networked groups where configuring a network is a centralized function done by hand." *Id.* at 1:34-47.

44.     "However, the Java/Jini approach is not without its disadvantages.  Both Java and Jini are free, open source applications.  The Java application environment is not designed for controlling messaging between different machines." *Id.* at 1:48-51.  "For example, the Java application is not concerned about the protocols between different hardware platforms.  Jini has some built-in security that allows code to be downloaded and run from different machines in confidence.  However, this limited security is insufficient for environments where it is necessary to further restrict code sharing or operation sharing among selected devices in a secure embedded system." *Id.* at 1:51-58.

45.     To solve these problems, the '136 patent proposes a "Secure Real-time Executive (SRE) 14 [which] provides an extension to the JVM 16 and allows Java to run on different processors for real-time applications.  The SRE 20 manages

messaging, security, critical data, file I/O multiprocessor task control and watchdog tasks in the Java environment as described below." *Id.* at 2:35-40. "For example, the SRE 14 may prevent noncritical vehicle applications, such as audio control, from being loaded onto processor 16." *Id.* at 2:66-3:1.

46.     The advantages of the invention of the '136 patent are taught as follows:

> The SRE 14 allows any variety of real-time, mission critical, nonreal-time and nonmission critical Java applications to be loaded onto the multiprocessor system 15. The SRE 14 then automatically manages the different types of applications and messages to ensure that the critical vehicle applications are not corrupted and processed with the necessary priority. The SRE 14 is secure software that cannot be manipulated by other Java applications.
>
> The SRE 14 provides priority preemption on a message scale across the entire system 15 and priority preemption on a task scale across the entire system 15. So the SRE 14 controls how the JVMs 10 talk to each other and controls how the JVMs 10 are started or initiated to perform tasks. The SRE 14 allows programmers to write applications using Java in a safe and secure real time environment. Thus, viruses can be prevented by SRE 14 from infiltrating the system 15.

*Id.* at 3:7-22.

47.     An important aspect of the invention of the '136 patent is the message manager:

> The message manager 50 determines the priority of sent and received messages. If the data transmitted and received by the sensor fusion thread 76 is higher priority than other data transmitted and received on the processor 84, then the sensor fusion data will be given priority over the other data. The task manager 58 controls the priority that the sensor fusion thread 76 is giving by processor 84. If the sensor fusion thread 76 has higher priority than, for example, an audio application that is also being run by processor 84, then the sensor fusion thread 76 will be performed before the audio application.

*Id.* at 4:60-5:3.

48.     Solutions to the problems outlined by the '136 patent are embodied in, for example, claim 31:

> An apparatus, comprising:
>
> a multiprocessor system configured to:
>
> identify a new device that is not currently coupled to the multiprocessor system;

17                    SECOND AMENDED COMPLAINT

detect a communication protocol used by the new device and connect the new device to the multiprocessor system when signaling from the new device conforms to a communication protocol used in the multiprocessor system;

configure the new device into the multiprocessor system when a data protocol operated by the new device conforms with a data protocol used in the multiprocessor system;

display an image representing the new device on a graphical interface;

identify data codes in the signaling from the new device identifying an application running on the new device, a data type used on the new device, and a security level associated with data stored in the new device;

use the identified security level to prevent unauthorized data from being loaded into the multiprocessor system;

identify a stored application in memory in the multiprocessor system that uses the same data type used on the new device and download the stored application from memory into a processor in the multiprocessor system;

display an image on the graphical user interface representing the stored application loaded into the processor in the multiprocessor system; and

use the stored application to direct data exchanged with the portable device to a selectable output or a selectable input identified on the graphical interface.

*Id.* at claim 31.

49.    The specification of the '049 patent also discloses shortcomings in the prior art and then explains, in detail, the technical way the claimed inventions resolve or overcome those shortcomings.  For example, the specification of the '049 patent discusses that:

A java application stack includes a Java layer 5 for running any one of multiple different applications. In one example, the applications are related to different vehicle operations such as Infrared (IR) and radar sensor control and monitoring, vehicle brake control, vehicle audio and video control, environmental control, driver assistance control, etc. A Java Virtual Machine (JVM) layer 16 provides the hardware independent platform for running the Java applications 5. A Jini layer 12 provides some limited security for the Java applications that run on different machines. However, the Jini layer 12 does not provide the necessary reconfiguration and security management necessary for a distributed real-time multiprocessor system.

Ex. 3 at 2:22-35. To resolve this issue, the '049 patent proposes:

> A Secure Real-time Executive (SRE) 14 provides an extension to the JVM 16 and allows Java to run on different processors for real-time applications. The SRE 20 manages messaging, security, critical data, file I/O multiprocessor task control and watchdog tasks in the Java environment as described below. The JVM 16, Jini 12 and SRE 14 can all be implemented in the same JVM 10.

*Id.* at 2:36-42.

50.     The '049 patent describes how this invention would apply to motor vehicles:

> The SRE 14 runs below the JVMs 10 in each processor and control tasks, messaging, security, etc. For example, the Java application 26 controls vehicle braking according to the sensor data collected by the sensor fusion Java application 32. The SRE 14 in one example prevents unauthorized data from being loaded into the processor 16 that runs brake control application 26. The SRE 14 also prevents other Java applications that are allowed to be loaded into processor 16 from disrupting critical braking operations, or taking priority over the braking operations, performed by Java application 26.
>
> For example, the SRE 14 may prevent noncritical vehicle applications, such as audio control, from being loaded onto processor 16. In another example, noncritical operations, such as security control application 28, are allowed to be loaded onto processor 16. However, the SRE 14 assigns the security messages low priority values that will only be processed when there are no braking tasks in application 26 that require processing by processor 16.

*Id.* at 2:57-3:8.

51.     Solutions to the problems outlined by the '049 patent are embodied, for example, in claim 29:

> A method for configuring real-time vehicle applications in a distributed multi-processor system operating in a vehicle, comprising:
>
> identifying vehicle applications running on different processors in the multiprocessor system;

operating a task manager that obtains different data and state information associated with the different vehicle applications;

operating a configuration manager that notifies the task manager upon detecting a failure running one of the identified vehicle applications in the multiprocessor system;

using the task manager for automatically identifying another processor in the multiprocessor system for running the identified vehicle application and redirecting the vehicle application associated with the detected failure to the other identified processor in the vehicle;

using the configuration manager to redirect the data and state information to the other identified processor in the vehicle after detecting the failure; and

initiating the identified application in the identified other processor.

*Id.* at claim 29.

52.     The specifications of the '028 patent and '117 patent also disclose shortcomings in the prior art and then explain, in detail, the technical way the claimed inventions resolve or overcome those shortcomings.  For example, the specification of the '028 patent (which closely mirrors the '117 patent specification) discusses that Java and Jini work together to "extend[] the Java application environment from a single virtual machine to a network of machines.  The Java application environment provides a good computing platform for distributed computing because both code and data can move from machine to machine.  The Jini infrastructure provides mechanisms for devices, services, and users to join and detach from a network.  Jini systems are more dynamic than is currently possible in networked groups where configuring a network is a centralized function done by hand."  Ex. 4 at 1:38-50.

53.     However,

[T]he Java/Jini approach is not without its disadvantages. Both Java and Jini are free, open source applications. The Java application environment is not designed for controlling messaging between

different machines. For example, the Java application is not concerned about the protocols between different hardware platforms. Jini has some built-in security that allows code to be downloaded and run from different machines in confidence. However, this limited security is insufficient for environments where it is necessary to further restrict code sharing or operation sharing among selected devices in a secure embedded system.

*Id.* at 1:51-61.

54.     The specifications of the '028 patent and '117 patent thus describe an embodiment of the invention that solves the problem posed by the patents, as follows:

A Secure Real-time Executive (SRE) 14 provides an extension to the JVM 16 and allows Java to run on different processors for real-time applications. The SRE 20 manages messaging, security, critical data, file I/0 multiprocessor task control and watchdog tasks in the Java environment as described below. The JVM 16, Jini 12 and SRE 14 can all be implemented in the same JVM 10, However, for explanation purposes, the JVM 10 and the SRE 14 will be shown as separate elements.

*Id.* at 2:39-47.

55.     The patents also describe how this invention would apply to motor vehicles:

The SRE 14 runs below the JVMs 10 in each processor and control tasks, messaging, security, etc. For example, the Java application 26 controls vehicle braking according to the sensor data collected by the sensor fusion Java application 32. The SRE 14 in one example prevents unauthorized data from being loaded into the processor 16 that runs brake control application 26. The SRE 14 also prevents other Java applications that are allowed to be loaded into processor 16 from disrupting critical braking operations, or taking priority over the braking operations, performed by Java application 26.

For example, the SRE 14 may prevent noncritical vehicle applications, such as audio control, from being loaded onto processor 16. In another example, noncritical operations, such as security control application 28, are allowed to be loaded onto processor 16. However, the SRE 14 assigns the security messages low priority values that will only be processed when

there are no braking tasks in application 26 that require processing by processor 16.

*Id.* at 2:60-3:10.

56.    Solutions to the problems outlined by the '028 patent are embodied, for example, in claim 18:

A method for reconfiguring applications in a multiprocessor, comprising:

operating a wireless device manager in at least one processor in the multiprocessor system, the wireless device manager configured to:

a. monitor for wireless signals from a new device not currently coupled to the multiprocessor system, wherein the new device runs a first software application that processes a first type of data; and

b. wirelessly connect the new device to the multiprocessor system;

operating a configuration manager in one of the multiple processors in the multiprocessor system, the configuration manager configured to:

c. monitor operations of the multiple processors in the multiprocessor system;

d. identify data codes in the wireless signals from the new device and use the data codes to identify the first type of data processed by the first software application running on the new device;

e. responsive to identifying the data codes from the new device, select a second software application from among multiple different software applications stored within memory in the multiprocessor system, wherein the second software application is associated with the first type of data processed by the new device and is not currently loaded into one of the multiple processors in the multiprocessor system;

f. download a copy of the second software application selected from the memory to one of the multiple processors in the multiprocessor system;

g. reconfigure one of the multiple processors in the multiprocessor system to run the second software application downloaded from the memory and take over control and operation of the new device; and

h. process data from the new device with the second software application operating in and controlled by the particular one of the multiple processors in the multiprocessor system; and

i. operating a security manager configured to determine authority to access at least some of the new devices, software applications or data used in the multiprocessor system.

*Id.* at claim 18.

57.    Solutions to the problems outlined by the '117 patent are embodied, for example, in claim 1:

A computer system, comprising:

a memory;

a real-time operating system;

a user interface;

one or more processors in a processing system, wherein the processing system is configured to:

operate a transceiver,

detect a new device within communication range of the transceiver,

detect a protocol used by the new device,

communicate with the new device in response to the detected protocol conforming with a protocol used by the processing system;

an application management system configured to:

identify data parameters that include at least one of data codes, data type and device ID associated with the new device,

> verify the new device data parameters as at least one of authorized or unauthorized; and
>
> responsive to verifying the data parameters as authorized, connect to the new device, dynamically configure an application to process the data types and launch the application in the processing system, wherein the application in response to launching is configured to take over control and operation of the new device including:
>
> initiating transfer of data from the new device to the operating system; and
>
> initiate processing of the data received from the new device.

Ex. 5 at claim 1.

58. In essence, the patents-in-suit relate to novel and non-obvious inventions in the field of in-vehicle device connectivity, specifically infotainment systems and the AUTOSAR platform in cars and trucks.

## COUNT I

### INFRINGEMENT OF U.S. PATENT NO. 6,778,073

59. MicroPairing repeats and realleges each allegation above as if fully set forth herein.

60. This cause of action arises under the patent laws of the United States, and in particular, 35 U.S.C. §§ 271, *et seq.*

61. MicroPairing is the owner of the '073 patent with all substantial rights to the '073 patent including the exclusive right to enforce, sue, and recover damages for past and future infringements.

62. The '073 patent is valid and enforceable and was duly issued in full compliance with Title 35 of the United States Code.

63. Attached hereto as Ex. 6, and incorporated herein by reference, is a claim chart detailing how Honda infringes the '073 patent.

**DIRECT INFRINGEMENT (35 U.S.C. § 271(a))**

64.     Honda has directly infringed and continues to directly infringe one or more claims of the '073 patent in this District and elsewhere in California and the United States.

65.     To this end, Honda has infringed and continues to infringe, either by itself or via an agent, at least claim 10 of the '073 patent by, among other things, making, having made, offering to sell, selling, testing and/or using Honda and Acura vehicles with infotainment systems.

**DAMAGES**

66.     Honda is liable for its infringements of the '073 patent pursuant to 35 U.S.C. § 271.

67.     MicroPairing has been damaged as a result of Honda's infringing conduct described in this Count.  Honda is, thus, liable to MicroPairing in an amount that adequately compensates it for Honda's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

**COUNT II**

**INFRINGEMENT OF U.S. PATENT NO. 7,793,136**

68.     MicroPairing repeats and realleges each allegation above as if fully set forth herein.

69.     This cause of action arises under the patent laws of the United States, and in particular, 35 U.S.C. §§ 271, *et seq.*

70.     MicroPairing is the owner of the '136 patent with all substantial rights to the '136 patent including the exclusive right to enforce, sue, and recover damages for past and future infringements.

71.     The '136 patent is valid and enforceable and was duly issued in full compliance with Title 35 of the United States Code.

72.     Attached hereto as Ex. 7, and incorporated herein by reference, is a claim chart detailing how Honda infringes the '136 patent.

**DIRECT INFRINGEMENT (35 U.S.C. § 271(a))**

73.     Honda has directly infringed and continues to directly infringe one or more claims of the '136 patent in this District and elsewhere in California and the United States.

74.     To this end, Honda has infringed and continues to infringe, either by itself or via an agent, at least claims 1 and 31 of the '136 patent by, among other things, making, having made, offering to sell, selling, testing and/or using Honda and Acura vehicles with infotainment systems.

**INDIRECT INFRINGEMENT (INDUCEMENT – 35 U.S.C. § 271(b))**

75.     Honda has also indirectly infringed and continues to indirectly infringe one or more claims of the '136 patent by inducing direct infringement by its Honda and Acura vehicle customers and end users.

76.     Honda has knowledge of the '136 patent, Honda's infringements, and the infringements of Honda's customers and end users based, at least, on independent notice served on Honda via Federal Express (complete with claim charts) and on Honda's receipt of the Original Complaint, First Amended Complaint, and this Second Amended Complaint in this action.

77.     Despite having knowledge that use of the Honda and Acura vehicles with infotainment systems infringe the '136 patent (which knowledge of infringement Honda obtained at least through the independent notice and claim charts MicroPairing served, as well as through the charts included with MicroPairing's Original Complaint, First Amended Complaint, and this Second Amended Complaint), Honda has specifically intended, and continues to specifically intend, for persons who acquire and use such vehicles, including Honda's customers and end users, to use the vehicles in a way that results in infringement of the '136 patent, including at least claims 18 and 31. Honda's ongoing actions represent a specific intent to induce infringement of

1  at least claims 18 and 31 of the '136 patent.  Honda knew or should have known that

2  its actions have induced, and continue to induce, such infringements.

3        78.    Honda specifically intends to induce infringement of the '136 patent by

4  instructing and encouraging its customers and end users to use Honda and Acura

5  vehicles in a manner that infringes the '136 patent.  For example, Honda provides

6  Honda and Acura owners and other users with user manuals on how to use

7  infotainment systems in a way that results in infringement of the '136 patent.  *See,*

8  *e.g.,* 2020 Acura MDX Owner's Manual

9  (http://techinfo.honda.com/rjanisis/pubs/OM/AH/BTZ52020OM/enu/BTZ52020OM.P

10  DF), which provides owners and other users with instructions on how to use the

11  infotainment system in a way that results in infringement of the '136 patent.

12        79.    In the alternative to actual knowledge, Honda was (and continues to be)

13  willfully blind to the fact that use of the Honda and Acura vehicles with infotainment

14  systems infringe the '136 patent.  Honda was put on notice that use of Honda and

15  Acura vehicles infringe the '136 patent through the independent notice and claim

16  charts MicroPairing served, as well as through the charts included with MicroPairing's

17  Original Complaint, First Amended Complaint, and this Second Amended Complaint.

18  By receiving such notice of infringement, Honda obtained a subjective belief that

19  there is a high probability that use of the Honda and Acura vehicles with infotainment

20  systems infringe the '136 patent.  Despite being put on notice of infringement and

21  provided with claim charts illustrating infringement, Honda has not taken any actions

22  to avoid the conduct alleged to infringe, has not responded to MicroPairing's notice

23  letter to offer any assertion as to why Honda and Acura vehicles with infotainment

24  systems do not infringe the '136 patent, and has not sought to remedy its

25  infringements by offering to take a license.  Honda's failure to act reflects deliberate

26  actions to avoid learning that the use of Honda and Acura vehicles with infotainment

27  systems infringe the '136 patent and, more generally, a policy of not earnestly

28  reviewing the intellectual property of others.

1

**DAMAGES**

2      80.    Honda is liable for its infringements of the '136 patent pursuant to 35

3  U.S.C. § 271.

4      81.    MicroPairing has been damaged as a result of Honda's infringing conduct

5  described in this Count.  Honda is, thus, liable to MicroPairing in an amount that

6  adequately compensates it for Honda's infringements, which, by law, cannot be less

7  than a reasonable royalty, together with interest and costs as fixed by this Court under

8  35 U.S.C. § 284.

9

**COUNT III**

10

**INFRINGEMENT OF U.S. PATENT NO. 7,178,049**

11      82.    MicroPairing repeats and realleges each allegation above as if fully set

12  forth herein.

13      83.    This cause of action arises under the patent laws of the United States, and

14  in particular, 35 U.S.C. §§ 271, *et seq.*

15      84.    MicroPairing is the owner of the '049 patent with all substantial rights to

16  the '049 patent including the exclusive right to enforce, sue, and recover damages for

17  past and future infringements.

18      85.    The '049 patent is valid and enforceable and was duly issued in full

19  compliance with Title 35 of the United States Code.

20      86.    Attached hereto as Ex. 8, and incorporated herein by reference, is a claim

21  chart detailing how Honda infringes the '049 patent.

22

**DIRECT INFRINGEMENT (35 U.S.C. § 271(a))**

23      87.    Honda has directly infringed and continues to directly infringe one or

24  more claims of the '049 patent in this District and elsewhere in California and the

25  United States.

26      88.    To this end, Honda has infringed and continues to infringe, either by

27  itself or via an agent, at least claims 29 – 31 of the '049 patent by, among other things,

28  developing and implementing in Honda and Acura vehicles software implementing

the AUTOSAR platform. Through its development and implementation of such software, Honda directs and controls the Honda and Acura vehicles' performance of the steps of the claimed methods, as Honda provides software that is not accessible to end users and automatically performs the steps of the claimed methods through normal operation of the vehicle with the implemented software without action by the user.

89. Further, Honda conditions receipt of various benefits upon performance of the patented methods (e.g., by providing users and passengers with redundant and/or fault tolerant safety and control systems to provide improved vehicle safety and reliability through the implementation of the AUTOSAR platform, as well as by providing manufacturer warranties conditioned upon operation of the vehicle without modification of the software).

90. In addition, by implementing in Honda and Acura vehicles software implementing the AUTOSAR platform in a manner in which the end user does not control performance of one or more steps of the claimed methods, Honda establishes and controls the manner and/or timing of the performance of such method steps. Indeed, Honda publicly indicates that the software in its vehicles (including the software implementing the AUTOSAR platform) is owned and controlled by Honda. *See, e.g.*, https://hondalink.honda.com/#/hondalinkTermsAndConditions.

91. In addition, at least for Honda and Acura vehicles that Honda leases to end users, on information and belief Honda retains title to and ownership and control over such Honda and Acura vehicles.

92. As discussed above, Honda does more than merely sell a product with software that performs the claimed methods. Rather, Honda exercises control over the equipment and software that performs the method claimed in at least claims 29-31 of the '049 patent.

93. In addition or in the alternative, Honda has infringed and continues to infringe, either by itself or via an agent, at least claims 29-31 of the '049 patent by,

among other things, testing and using Honda and Acura vehicles that operate on the AUTOSAR platform.  For example, on information and belief, Honda, either by itself or via an agent, conducts testing on and/or uses Honda and Acura vehicles that operate on the AUTOSAR platform as part of its research and development, manufacturing, and/or quality control processes.  Further, on information and belief, Honda, either by itself or via an agent, conducts testing on and/or uses Honda and Acura vehicles that operate on the AUTOSAR platform in connection with public demonstrations, automotive shows, trade shows, and dealership test drives with customers.

<strong>INDIRECT INFRINGEMENT (INDUCEMENT – 35 U.S.C. § 271(b))</strong>

94.    In addition and/or in the alternative to its direct infringement, Honda has indirectly infringed and continues to indirectly infringe one or more claims of the '049 patent by inducing direct infringement by its Honda and Acura vehicle customers and end users.

95.    Honda has knowledge of the '049 patent, its infringements, and the infringements of its customers and end users based, at least, on independent notice served on Honda via Federal Express (complete with claim charts) and on Honda's receipt of the Original Complaint, First Amended Complaint, and this Second Amended Complaint in this action.

96.    Despite having knowledge that use of the Honda and Acura vehicles with infotainment systems and that operate on the AUTOSAR platform infringe the '049 patent (which knowledge of infringement Honda obtained at least through the independent notice and claim charts MicroPairing served, as well as through the charts included with MicroPairing's Original Complaint, First Amended Complaint, and this Second Amended Complaint), Honda has specifically intended, and continues to specifically intend, for persons who acquire and use such vehicles, including Honda's customers and end users, to use the vehicles in a way that results in infringement of the '049 patent, including at least claims 29 – 31.  Honda's ongoing actions represent a specific intent to induce infringement of at least claims 29 – 31 of the '049 patent.

Honda knew or should have known that its actions have induced, and continue to induce, such infringements.

97.     Honda specifically intends to induce infringement of the '049 patent by instructing and encouraging its customers and end users to use their Honda and Acura vehicles in a manner that infringes the '049 patent.  For example, Honda provides Honda and Acura owners and other users with user manuals, such as the 2020 Acura MDX Owner's Manual (http://techinfo.honda.com/rjanisis/pubs/OM/AH/BTZ52020OM/enu/BTZ52020OM.PDF), which guides users with instructions on how to use the vehicle safety features that implicate the AUTOSAR platform in a way that results in infringement of the '049 patent. Honda also provides in its vehicles' computer programs (i.e., instructions) that cause performance of claimed methods.

98.     In the alternative to actual knowledge, Honda was (and continues to be) willfully blind to the fact that use of the Honda and Acura vehicles that operate on the AUTOSAR platform infringe the '049 patent.  Honda was put on notice that use of Honda and Acura vehicles infringe the '049 patent through the independent notice and claim charts MicroPairing served, as well as through the charts included with MicroPairing's Original Complaint, First Amended Complaint, and this Second Amended Complaint.  By receiving such notice of infringement, Honda obtained a subjective belief that there is a high probability that use of the Honda and Acura vehicles that operate on the AUTOSAR platform infringe the '049 patent.  Despite being put on notice of infringement and provided with claim charts illustrating infringement, Honda has not taken any actions to avoid the conduct alleged to infringe, has not responded to MicroPairing's notice letter to offer any assertion as to why Honda and Acura vehicles that operate on the AUTOSAR platform do not infringe the '049 patent, and has not sought to remedy its infringements by offering to take a license.  Honda's failure to act reflects deliberate actions to avoid learning that the use of Honda and Acura vehicles that operate on the AUTOSAR platform infringe

the '049 patent and, more generally, a policy of not earnestly reviewing the intellectual property of others.

## DAMAGES

99.     Honda is liable for its infringements of the '049 patent pursuant to 35 U.S.C. § 271.

100.    MicroPairing has been damaged as a result of Honda's infringing conduct described in this Count.  Honda is, thus, liable to MicroPairing in an amount that adequately compensates it for Honda's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT IV

## INFRINGEMENT OF U.S. PATENT NO. 8,020,028

101.    MicroPairing repeats and realleges each allegation above as if fully set forth herein.

102.    This cause of action arises under the patent laws of the United States, and in particular, 35 U.S.C. §§ 271, et seq.

103.    MicroPairing is the owner of the '028 patent with all substantial rights to the '028 patent including the exclusive right to enforce, sue, and recover damages for past and future infringements.

104.    The '028 patent is valid and enforceable and was duly issued in full compliance with Title 35 of the United States Code.

105.    Attached hereto as Ex. 9, and incorporated herein by reference, is a claim chart detailing how Honda infringes the '028 patent.

## DIRECT INFRINGEMENT (35 U.S.C. § 271(a))

106.    Honda has directly infringed and continues to directly infringe one or more claims of the '028 patent in this District and elsewhere in California and the United States.

107. To this end, Honda has infringed and continues to infringe, either by itself or via an agent, at least claim 18 of the '028 patent by, among other things, developing and implementing infotainment systems and associated software in Honda and Acura vehicles. Through its development and implementation of such infotainment systems, Honda directs and controls the Honda and Acura vehicles' performance of the steps of the claimed methods, as Honda provides software that is not accessible to end users and automatically performs the steps of the claimed methods through normal operation of the vehicle with the implemented infotainment system and associated software without action by the user.

108. Further, Honda conditions receipt of various benefits upon performance of the patented methods (e.g., by providing users and passengers with seamless integration of key infotainment system functionality consistent with consumer expectations through the implementation of the implementation of the infotainment systems and associated software, as well as by providing manufacturer warranties conditioned upon operation of the vehicle without modification of the infotainment system or software).

109. In addition, by implementing in Honda and Acura vehicles infotainment systems in a manner in which the end user does not control performance of one or more steps of the claimed methods, Honda establishes and controls the manner and/or timing of the performance of such method steps. Indeed, Honda publicly indicates that the software in its vehicles (including the software implementing the AUTOSAR platform) is owned and controlled by Honda. *See, e.g.*, https://hondalink.honda.com/#/hondalinkTermsAndConditions.

110. In addition, at least for Honda and Acura vehicles that Honda leases to end users, on information and belief Honda retains title to and ownership and control over such Honda and Acura vehicles.

111. As discussed above, Honda does more than merely sell a product with software that performs the claimed methods. Rather, Honda exercises control over the

equipment and software that performs the method claimed in at least claim 18 of the '028 patent.

112.   In addition or in the alternative, Honda has infringed and continues to infringe, either by itself or via an agent, at least claim 18 of the '028 patent by, among other things, testing and using Honda and Acura vehicles with infotainment systems. For example, on information and belief, Honda, either by itself or via an agent, conducts testing on and/or uses Honda and Acura vehicles with infotainment systems as part of its research and development, manufacturing, and/or quality control processes.  Further, on information and belief, Honda, either by itself or via an agent, conducts testing on and/or uses Honda and Acura vehicles with infotainment systems in connection with public demonstrations, automotive shows, trade shows, and dealership test drives with customers.

### INDIRECT INFRINGEMENT (INDUCEMENT – 35 U.S.C. § 271(b))

113.   In addition and/or in the alternative to its direct infringement, Honda has indirectly infringed and continues to indirectly infringe one or more claims of the '028 patent by inducing direct infringement by its Honda and Acura vehicle customers and end users.

114.   Honda has knowledge of the '028 patent, its infringements, and the infringements of its customers and end users based, at least, on Honda's receipt of the First Amended Complaint and of this Second Amended Complaint via service by Notice of Electronic Filing, which constitutes service under the Local Rules of this Court.

115.   Despite having knowledge that use of the Honda and Acura vehicles with infotainment systems and that employ infotainment systems infringe the '028 patent (which knowledge of infringement Honda obtained at least through the claim charts included with MicroPairing's First Amended Complaint and this Second Amended Complaint), Honda has specifically intended, and continues to specifically intend, for persons who acquire and use such vehicles, including Honda's customers and end

34                    SECOND AMENDED COMPLAINT

users, to use the vehicles in a way that results in infringement of the '028 patent, including at least claim 18.  Honda's ongoing actions represent a specific intent to induce infringement of at least claim 18 of the '028 patent.  Honda knew or should have known that its actions have induced, and continue to induce, such infringements.

116.   Honda specifically intends to induce infringement of the '028 patent by instructing and encouraging its customers and end users to use their Honda and Acura vehicles in a manner that infringes the '028 patent.  For example, Honda provides Honda and Acura owners and other users with user manuals on how to use the infotainment system in a way that results in infringement of the '028 patent.  *See, e.g.*, 2020 Acura MDX Owner's Manual (http://techinfo.honda.com/rjanisis/pubs/OM/AH/BTZ52020OM/enu/BTZ52020OM.PDF), which provides owners and users with instructions on how to use the infotainment system in a way that results in infringement of the '028 patent.  Honda also provides in its vehicles' computer programs (i.e., instructions) that cause performance of claimed methods.

117.   In the alternative to actual knowledge, Honda was (and continues to be) willfully blind to the fact that use of the Honda and Acura vehicles with infotainment systems infringe the '028 patent.  Honda was put on notice that use of Honda and Acura vehicles infringe the '136 patent through the claim charts included with MicroPairing's First Amended Complaint and this Second Amended Complaint.  By receiving such notice of infringement, Honda obtained a subjective belief that there is a high probability that use of the Honda and Acura vehicles with infotainment systems infringe the '028 patent.  Despite being put on notice of infringement and provided with claim charts illustrating infringement, Honda has not taken any actions to avoid the conduct alleged to infringe, has not responded to MicroPairing's complaint or claim charts to offer any assertion as to why Honda and Acura vehicles with infotainment systems do not infringe the '028 patent, and has not sought to remedy its infringements by offering to take a license.  Honda's failure to act reflects deliberate

actions to avoid learning that the use of Honda and Acura vehicles with infotainment systems infringe the '028 patent and, more generally, a policy of not earnestly reviewing the intellectual property of others.

<strong>DAMAGES</strong>

118.   Honda is liable for its infringements of the '028 patent pursuant to 35 U.S.C. § 271.

119.   MicroPairing has been damaged as a result of Honda's infringing conduct described in this Count.  Honda is, thus, liable to MicroPairing in an amount that adequately compensates it for Honda's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

<strong>COUNT V</strong>

<strong>INFRINGEMENT OF U.S. PATENT NO. 8,006,117</strong>

120.   MicroPairing repeats and realleges each allegation above as if fully set forth herein.

121.   This cause of action arises under the patent laws of the United States, and in particular, 35 U.S.C. §§ 271, et seq.

122.   MicroPairing is the owner of the '117 patent with all substantial rights to the '117 patent including the exclusive right to enforce, sue, and recover damages for past and future infringements.

123.   The '117 patent is valid and enforceable and was duly issued in full compliance with Title 35 of the United States Code.

124.   Attached hereto as Ex. 10, and incorporated herein by reference, is a claim chart detailing how Honda infringes the '117 patent.

<strong>DIRECT INFRINGEMENT (35 U.S.C. § 271(a))</strong>

125.   Honda has directly infringed and continues to directly infringe one or more claims of the '117 patent in this District and elsewhere in California and the United States.

126.   To this end, Honda has infringed and continues to infringe, either by itself or via an agent, at least claim 1 of the '117 patent by, among other things, making, having made, offering to sell, selling, testing and/or using Honda and Acura vehicles with infotainment systems.

### DAMAGES

127.   Honda is liable for its infringements of the '117 patent pursuant to 35 U.S.C. § 271.

128.   MicroPairing has been damaged as a result of Honda's infringing conduct described in this Count.  Honda is, thus, liable to MicroPairing in an amount that adequately compensates it for Honda's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

### RELIEF SOUGHT

MicroPairing respectfully requests the following relief:

A.   Judgment and Order that Honda has directly infringed one or more claims of each of the patents-in-suit;

B.   Judgment and Order that Honda has induced infringement of one or more claims of the '136, '049 and '028 patents;

C.   Judgment and Order that Honda must pay MicroPairing past and future damages under 35 U.S.C. § 284, including supplemental damages arising from any continuing, post-verdict infringement for the time between trial and entry of the final judgment, together with an accounting, as needed, as provided under 35 U.S.C. § 284;

D.   Judgment and Order that Honda must pay MicroPairing reasonable ongoing royalties on a go-forward basis after Final Judgment;

E.   Judgment and Order that Honda must pay MicroPairing pre-judgment and post-judgment interest on the damages award;

F.   Judgment and Order that Honda must pay MicroPairing's costs;

1    G.    Judgment and Order that the Court find this case exceptional under the

2          provisions of 35 U.S.C. § 285; and

3    H.    Such other and further relief as the Court may deem just and proper.

4                        **DEMAND FOR JURY TRIAL**

5          Pursuant to Federal Rule of Civil Procedure 38(b), MicroPairing demands a

6    trial by jury on all issues triable by jury.

7

8    DATED: September 28, 2021    Respectfully submitted,

9

10                        */s/ Ryan E. Hatch*

                         RYAN E. HATCH (SBN 235577)

11                     ryan@hatchlaw.com

12                     Hatch Law, PC

                     13323 Washington Blvd., Suite 302

13                     Los Angeles, CA 90066

14                     Tel: 310-279-5076

                     Fax: 310-693-5328

15

16                     Edward R. Nelson III (Texas SBN 00797142)

                     ed@nelbum.com

17                     *admitted pro hac vice*

18                     Ryan P. Griffin (Texas SBN 24053687)

                     ryan@nelbum.com

19                     *admitted pro hac vice*

20                     Brian P. Herrmann (Texas SBN 24083174)

                     brian@nelbum.com

21                     *admitted pro hac vice*

22                     NELSON BUMGARDNER CONROY PC

                     3131 West Seventh Street

23                     Suite 300

24                     Fort Worth, TX 76107

                     Telephone: 817.377.9111

25

26                     Timothy E. Grochocinski (Illinois SBN 6295055)

                     tim@nelbum.com

27                     *admitted pro hac vice*

28                     C. Austin Ginnings (New York SBN 4986691)

austin@nelbum.com
*admitted pro hac vice*
NELSON BUMGARDNER CONROY PC
15020 S. Ravinia Avenue, Suite 29
Orland Park, Illinois 60462
Telephone: 708.675.1974

*Attorneys for Plaintiff*
 *MICROPAIRING TECHNOLOGIES LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was filed electronically via the CM/ECF System on September 28, 2021.  This filing will generate a Notice of Electronic filing ("NEF") which will be sent to all counsel of record in this case. Under Local Rule 5-3.2.1, this NEF constitutes service pursuant to the Federal Rules of Civil Procedure.

*/s/ Ryan E. Hatch*